# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| JERRY A. SCHAMEL, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case number 4:09cv1729 TCM** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This is a 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying Jerry A. Schamel's (Plaintiff) application for supplemental security income (SSI) under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381-1383b.[1] Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Plaintiff applied for SSI in March 2008, alleging he was disabled as of August 2004 by congestive heart failure, sleep apnea, carpal tunnel, arthritis, stroke, depression, and anxiety. (R.[2] at 163-65.) His application was denied initially and after a hearing held in April 2009

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

[2]References to "R." are to the administrative record filed by the Commissioner with his answer.

before Administrative Law Judge (ALJ) Victor Horton.[3]  (<u>Id.</u> at 7-71, 73, 78, 118-22.)  The Appeals Council then denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (<u>Id.</u> at 3-5.)

### **<u>Testimony Before the ALJ</u>**

Plaintiff, represented by counsel, and Delores Gonzalez, a vocational expert (VE), testified at the administrative hearing.  Plaintiff's mother, Charlotte Branz, was present but did not testify.

Before any testimony was taken, the ALJ clarified that Plaintiff wished only a closed period to be considered, specifically, the period between March 20, 2007, and April 23, 2008. (<u>Id.</u> at 12-13, 80.)

Plaintiff testified that he was born in 1959, is divorced, has one child, a 22-year old daughter, and lives in his mother's unfinished basement.  (<u>Id.</u> at 14.)  The walk-out basement does not have a bathroom, but does have a television, microwave, refrigerator, and utility sink. (<u>Id.</u> at 15.)  He has been living with his mother for four years.  (<u>Id.</u> at 16.)  Also present in the household is his mother's husband.  (<u>Id.</u>)  Plaintiff has a twelfth grade education and one year of technical schooling.  (<u>Id.</u> at 40.)  He is right-handed, 5 feet 8 inches tall, and weighs 230 pounds.  (<u>Id.</u>)

---

[3]After his application was initially denied, Plaintiff requested a hearing, which was denied by an ALJ as being untimely filed.  After his counsel produced documentation showing that the request was timely, the Appeals Council remanded his application for a hearing, which was then held before ALJ Horton.

Currently, Plaintiff has a part-time job doing janitorial work, e.g., emptying trash cans and cleaning bathrooms.  (<u>Id.</u> at 17.)  He has had the job for almost thirty days, and works two and one-half hours at night during the work week and five hours a day on the weekends.  (<u>Id.</u>)  He does not think he can work any more hours.  (<u>Id.</u> at 18.)  Also, his boss does not want him to because he gets red in the face and sweats profusely if he tries to work more hours.  (<u>Id.</u> at 43.)

Plaintiff further testified that he has not repaired any cars since April 2001.  (<u>Id.</u> at 19.)  He had then worked refinishing automobiles and had his own business from 1982 to 2001.  (<u>Id.</u> at 20.)  From 1982 to 1994, he also worked for another company.  (<u>Id.</u>)  From 1994 to 2001, he worked only at his own business, which was at his house.  (<u>Id.</u>)  His customers were his friends.  (<u>Id.</u> at 21.)  He has not filed a tax return from 1998 to the present.  (<u>Id.</u>)  From 1998 to 2001, he earned between $15,000 to $20,000 a year.  (<u>Id.</u> at 22.)

In September 2008, he worked for three days for a janitorial company.  (<u>Id.</u> at 19.)  He had to stop this job because it was too hard on his back.  (<u>Id.</u>)

His house was foreclosed on in 2001.  (<u>Id.</u> at 22.)   In 2002, his father had a stroke and was then diagnosed with colon cancer.  (<u>Id.</u>)  He took care of his father for 18 months until his death.  (<u>Id.</u>)  He then moved in with his mother.  (<u>Id.</u>)

In 2009, he worked for "February for Labor Ready," doing mostly various janitorial jobs.  (<u>Id.</u> at 22-23.)  He stopped working there when he was sent to do a moving job and was unable to complete it.  (<u>Id.</u> at 23.)  They would not let him return until he had a list of his restrictions from his cardiologist.  (<u>Id.</u>)

He studied at a technical school to be an auto body painter.  (Id. at 24.)  He had to quit working as a painter because the over-exposure to chemicals made him sick.  (Id. at 25.)  The heaviest weight he had to lift doing this work was 50 to 75 pounds, depending on the age of the car.  (Id. at 26.)

Asked to explain why he can no longer work, Plaintiff testified that his congestive heart failure causes dizziness and occasional black outs.  (Id.)  Plaintiff could not explain a reference in his cardiologist's notes to him not having congestive heart failure; it was the cardiologist who told him he had it.  (Id. at 27.)  He was diagnosed with it in August 2004.  (Id.)  He has not had any surgeries on his heart because the problems are being addressed with medication.  (Id.)  He's had a catherization to open some closed arteries.  (Id. at 27-28.)

He has sleep apnea but cannot use a continuous positive airway pressure (CPAP) machine because it keeps him awake.  (Id. at 28.)  The machine was first titrated to a thirteen and was now a nine.  (Id. at 29.)  It had gone down because he had had septal plastic surgery.  (Id.)  He can breathe better after the surgery; however, fumes still bother him.  (Id. at 30.)  Plaintiff has tried sedatives but the first two prescriptions were ineffective and the third made him shake.  (Id.)

Plaintiff had carpal tunnel surgery in July 2005.  (Id. at 30-31.)  There was no improvement.  (Id. at 31.)  Although he can make a grip, he inadvertently drops things.  (Id.)  He can pick up an ink pen from a table without a problem but not a straight pen.  (Id.)

Also affecting his ability to work is his anxiety and depression.  (Id. at 32.)  This causes him excessive worry and restlessness.  (Id.)  He does not like strangers.  (Id.)  He has suicidal

and homicidal thoughts "too often," i.e., once a week. (<u>Id.</u> at 32, 47.) The anxiety makes him fearful. (<u>Id.</u> at 46.) Every couple of months during the relevant period he would have panic attacks and have to lie down. (<u>Id.</u>) He would have a couple attacks every week where he would stay in bed and not do anything. (<u>Id.</u> at 47.) Financial problems were causing depression. (<u>Id.</u> at 46.) He was seeing a Dr. Taca but stopped because he could not function on the strong anti-psychotic medication the doctor prescribed. (<u>Id.</u> at 33.) He has not gone back to see him, although he is continuing to take the Cymbalta that was left over from when he was. (<u>Id.</u>) The doctor had told him to throw the Cymbalta out, but he did not. (<u>Id.</u>)

Plaintiff is taking seven medications, including for high cholesterol and blood thinners; the medications have side effects of nausea, dizziness, and diarrhea. (<u>Id.</u> at 34.) During the relevant time period, he had dizzy spells at least once a day. (<u>Id.</u> at 44.) His doctor has restricted him to lifting no more than sixty pounds. (<u>Id.</u> at 34.) He takes over-the-counter medication for the arthritis in his spine. (<u>Id.</u> at 35.) His chiropractor died "a long time ago" and he has never tried to find another. (<u>Id.</u>)

Asked about his activities, Plaintiff reported that he can do laundry, dishes, make his bed, vacuum, and sweep. (<u>Id.</u> at 36.) He occasionally trims the bushes. (<u>Id.</u> at 37.) He has a driver's license and a car. (<u>Id.</u>) He does not often go on errands. (<u>Id.</u>) He does not eat with his mother. (<u>Id.</u> at 38.) He watches crime shows and movies. (<u>Id.</u>)

Plaintiff used to have a drinking problem. (<u>Id.</u>) His last driving while intoxicated charge was in 1993. (<u>Id.</u>) He last had a drink thirty days ago. (<u>Id.</u> at 39, 42.) When he was

drinking the most, he drank twelve beers a day.  (Id. at 39.)  That was for most of his life.  (Id.)
Plaintiff smokes less than a pack of cigarettes a day.  (Id. at 41.)

Plaintiff has spent time in jail, including 67 days the previous summer, for back child
support.  (Id. at 41.)  He has been in jail for child support "half a dozen" times, including a
four-year term in prison.  (Id.)

Plaintiff is constantly fatigued.  (Id. at 44.)  During the relevant period, he would lay
down "almost all day long," i.e., at least sixteen hours a day.  (Id.)  He cannot sit in a chair
because it hurts his back and neck.  (Id.)

Plaintiff has had problems with numbness in his hands for at least ten years.  (Id. at 45.)
His hands tingle and throb so badly at night that he wakes up.  (Id.)  During the relevant
period, he would drop things every day.  (Id.)

Ms. Gonzalez testified, without objection, as a vocational expert (VE).  She described
Plaintiff's work as an office cleaner as heavy and unskilled.  (Id. at 49.)  His job as a
manger/owner of an auto body repair garage is light skilled work in terms of the management
portion and medium, skilled work in terms of the repair part.  (Id. at 50.)  His work as an
automotive painter is medium, semi-skilled work.  (Id.)

Ms. Gonzalez was asked to assume a hypothetical individual of Plaintiff's age,
education, and work experience at the time of the alleged disability onset date, March 2007,
and who could occasionally lift or carry twenty pounds; frequently lift and carry ten  pounds;
stand or walk about six hours during an eight-hour day; sit for six hours during such a day;
occasionally climb stairs, ramps, and ladders; never climb ropes and scaffolds; and

occasionally balance, stoop, kneel, crouch, or crawl.  (Id. at 50-51.)  This person had to avoid concentrated exposure to hazardous heights and machinery.  (Id. at 51.)  The only job that such person could perform that was included in Plaintiff's past work was his job as a sandwich board carrier, or sign twirler, and Plaintiff had held this job for only six days.  (Id. at 49, 51.)  Such person would also be able to do the management portion only of Plaintiff's past work as a manager of an auto repair shop.  (Id. at 51.)

This hypothetical person would, however, be able to work as a cashier or a fast foods worker, both of which jobs existed in significant numbers in the St. Louis and national economies.  (Id. at 52.)

If this hypothetical person also had to have a stand/walk option at the job site and needed to frequently change positions, only 20% of the jobs previously described would be available.  (Id. at 52-53.)  Also available would be a job as a ticket taker or as an order caller.  (Id. at 53.)

If this hypothetical person needed to be limited to frequent handling, fingering, and gross and fine manipulation, he would be able to work as an order caller, ticket taker, and cashier.  (Id. at 53-54.)  If this person had all the limitations described by Plaintiff, there were no jobs the person could perform.  (Id. at 54.)

Asked by Plaintiff's counsel how she determined the number of jobs available, Ms. Gonzalez cited the Bureau of Labor Statistics report from the previous September.  (Id. at 54-55.)  If the hypothetical person would need to be absent from work at least three times per month due to health-related conditions, he would not be able to perform any competitive work.

(Id. at 56-57.) If he was unable to maintain concentration and pace for the majority of the day, there were no jobs the person could perform. (Id. at 57.) A Global Assessment of Functioning rating of 47[4] would preclude employment. (Id.)

Ms. Gonzalez replied in the affirmative when asked if her testimony was consistent with the Dictionary of Occupational Titles (DOT). (Id. at 58.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his application, records from health care providers, and assessments by examining and non-examining consultants.

When applying for SSI, Plaintiff completed a Disability Report. (Id. at 219-28.) He listed his height as 5 feet 8 inches tall and his weight as 250 pounds. (Id. at 219.) Congestive heart failure, sleep apnea, carpal tunnel, arthritis, stroke, depression, and anxiety limited his ability to work by causing blackouts, breathing problems, dizziness, and vision loss. (Id. at 220.) These impairments first interfered with his ability to work on August 19, 2004, and prevented him from working the same day. (Id.) He stopped working, however, in April 2001 when his business went bankrupt. (Id.) The job he had held the longest was as an automobile painter. (Id. at 221.) His doctors included George M. Kichura, M.D., for his heart problems,

------

[4]"According to the [DSM-IV-TR], the Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 34.

his next appointment was in March 2008, and Arturo Taca, M.D., for his depression and anxiety, his first visit had been in April 2007, his last in January 2008, and his next would be in March 2008. (Id. at 223.) He was taking eight medications prescribed by Dr. Kichura and one, Cymbalta, prescribed by Dr. Taca. (Id. at 225.)

When applying for SSI, Plaintiff also completed a Missouri Supplemental Questionnaire. (Id. at 209-16.) He reported that he lives with his 68-year old mother and 45-year old stepfather. (Id. at 210.) He tries to avoid them. (Id. at 211.) He is able to do various household chores, with the exception of ironing. (Id. at 212.) He also does yard work. (Id. at 213.) He spends his time eating meals and hunting for jobs. (Id.) He gets bad headaches if he reads. (Id.) He leaves his house once a week for one to two hours at a time. (Id. at 214.) He has difficulty following instructions if they are too long. (Id. at 215.) He does not have any difficulty getting along with other people, nor they with him. (Id.)

Plaintiff's mother completed a Function Report on his behalf. (Id. at 232-39.) She reported that she spends "very little time" with him; their time together consists of grocery shopping or doctor visits. (Id. at 232.) During the day, Plaintiff watches television and eats. (Id.) Before his impairments, Plaintiff could do "just about anything"; now, he has no endurance. (Id. at 233.) He can take care of personal grooming needs, but needs sleeping pills. (Id.) He prepares his own meals, which consists of sandwiches, fruit, and microwaved meals. (Id. at 234.) He goes outside to smoke. (Id. at 235.) He can drive, but does not have a car. (Id.) He is not allowed to go out because he might drink; he and her second husband do not get along. (Id. at 236.) His impairments affect his ability to concentrate. (Id. at 237.)

His doctor has told her that Plaintiff is suicidal, homicidal, and extremely depressed. (Id. at 238.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of his application. (Id. at 240-47.) There had been no change in his condition since he last completed a report. (Id. at 241.) Since that time, he had had a blood test administered at the Department of Corrections and an electrocardiogram (EKG) by Dr. Kichura. (Id. at 244.)

Plaintiff had reportable annual earnings from 1976 to 1982, in 1984, and from 1986 to 1997. (Id. at 154.) In the years from 1986 to 1994, when Plaintiff worked at auto body repair shops, his earnings were substantial and ranged from $63,553.60, in 1987, to a low of $26,546.67, in 1994. (Id.) In six of those nine years, his annual earnings were between $37,000 and $64,000. (Id.) Plaintiff had no reportable annual earnings from 1998 to 2007, inclusive. (Id.) His annual earnings in 2008, the last year included, were $120.00. (Id.)

The relevant medical records before the ALJ are summarized below in chronological order.[5]

In October 2001, Plaintiff was seen at St. John's Mercy Medical Center (St. John's). (Id. at 317-28, 396-406.) He reported that he had a "long-standing" history of hypertension and cardiovascular accident. (Id. at 317, 396.) He felt depressed and anxious. (Id. at 318, 397.) He had contemplated suicide but had no plan. (Id.) He smoked two packs of cigarettes a day, and had for twenty-five years, and drank six beers a day. (Id. at 319, 398.) He had been

---

[5]Medical records that are not within the time frame at issue *and* do not otherwise relate to that period are not discussed. For instance, records relating to complaints of back pain in 2004 are not summarized. (See id. at 316.)

unemployed for six years.  (Id.)  He lived with his father and had been in and out of jail for

non-payment of child support.  (Id.)  He was started on Celexa for his depression and referred

to a psychiatrist.  (Id. at 327, 405.)  Two weeks later, Plaintiff returned with complaints of

continuing chest pains on exertion and shortness of breath.  (Id. at 328, 406.)  He felt fatigued

in the morning.  (Id.)  He reported no improvement on the Celexa.  (Id. at 330.)  Wellbutrin

was added to his medication regimen.  (Id.)

Plaintiff returned to St. John's one year later.  (Id. at 331, 409.)  The gap was due to his

incarceration for back child-support.  (Id.)  He was restarted on his blood pressure and anti-

depressant medications.  (Id.)

In August 2004, Plaintiff underwent a cardiac catherization.  (Id. at 496-523.)  Because

of his "history of significant noncompliance" with medications and clinical follow-ups and his

"extreme[] indifferen[ce]" to discussions about this history, Plaintiff was to be seen by a

psychiatrist before he was discharged.  (Id. at 498.)  Two months later, Plaintiff's returned to

St. John's.  (Id. at 332, 410.)  He reported that he had been diagnosed three yeas earlier with

obstructive sleep apnea and had been given a CPAP machine.  (Id.)  He could not use the

machine, however, as it did not stay on his face and he needed a referral to an ear, nose and

throat (ENT) doctor.  (Id.)  After seeing an ENT, it was decided that Plaintiff would undergo

a septoplasty.  (Id. at 333.)

The following month, in November, Plaintiff reported to a cardiologist, Charles Carey,

M.D., that he had not been having chest discomfort but was getting short of breath after

climbing one flight of stairs and was not doing any regular activity.  (Id. at 386.)  Asked if he

was drinking alcohol, he replied that he had had none that week.  (Id.)  Dr. Carey noted that it was Monday.  (Id.)  Plaintiff's mother, who had accompanied him to the office, said that Plaintiff had become inebriated over the weekend and had "slept it off for 24 hours."  (Id.)  Plaintiff's ejection fraction had improved and was in the mild to moderate range.  (Id.)  Dr. Carey told Plaintiff, as he had before, that he should not drink or smoke and should start walking.  (Id.)  He also told him not to work outside in the cold, shovel snow, or lift heavy weights.  (Id.)

In May 2005, Plaintiff was diagnosed with severe carpal tunnel syndrome.  (Id. at 334, 450-53.)

In June, a cardiologist, Alan D. Camp, M.D., described Plaintiff's cardiac condition as stable.  (Id. at 377.)

In July, a notation was entered on Plaintiff's medical records that his primary care physician did not feel comfortable renewing his prescription for Celexa.  (Id. at 341, 41.)  She was going to fill it until he had an evaluation appointment with a psychiatrist, but would not fill it again if he did not keep that appointment.  (Id.)

Also in July, Plaintiff had bilateral carpal tunnel release.  (Id. at 376, 489-90.)  The following month, he had a septoplasty to reduce a nasal obstruction and correct a septal deviation.  (Id. at 392, 491-95.)

Plaintiff was seen by Rhody D. Eisenstein, M.D., at the Sleep Medicine and Research Center in October.  (Id. at 373-74.)  It was recommended that he restart using the CPAP machine.  (Id. at 374.)  It was noted that the Celexa he was taking might be contributing to his

insomnia and aggravating his restless leg syndrome.  (Id.)  It was not helping his anxiety and depression.  (Id.)  Dr. Eisenstein hoped that Plaintiff would be tapered off the medication after he saw his psychiatrist the next week.  (Id.)

The doctors at St. John's referred him to Dr. Kichura with the Midwest Heart Group. (Id. at 554, 557-58.)  When Plaintiff saw him in December,[6] he reported that he was continuing to have occasional episodes of dizziness but did not have any chest pain, orthopnea (discomfort in breathing when lying flat), or paroxysmal nocturnal dyspnea (acute shortness of breath occurring suddenly at night).  (Id. at 554.)  His blood pressure had improved.  (Id.) He had no peripheral edema.  (Id.)  He was to continue with his current heart medications, with the exception of Imdur, and return in six months.  (Id.)

Plaintiff saw James K. Walsh, Ph.D., with the Sleep Medicine and Research Center in January 2006 for evaluation and treatment of his severe sleep apnea.  (Id. at 371-72.)  Plaintiff reported that he was unable to use the CPAP machine on a nightly basis because he unintentionally removes the mask.  (Id. at 371.)  He smoked cigarettes until bedtime and during the night.  (Id.)  He also drank at least two liters of caffeinated soda up until bedtime.  (Id.) He occasionally drank alcohol.  (Id.)  Dr. Walsh discussed sleep hygiene with Plaintiff.  (Id.) Plaintiff also inquired about getting a new prescription for Ambien.  (Id.)  Dr. Walsh declined to give him one due to his poor sleep hygiene "and other issues."  (Id.)  It was noted that Plaintiff had not seen a psychiatrist since discontinuing Celexa.  (Id.)  His bedtime varied from

---

[6]Plaintiff had seen Dr. Kichura in April 2005, at which time he elected to stay with Dr. Camp, and again in June 2005.  (Id. at 555-56.).

midnight to 5 o'clock in the morning. (Id.) He would wake up two hours after falling asleep and then every thirty minutes thereafter. (Id.) Dr. Walsh recommended that Plaintiff increase his use of the CPAP machine with a prescribed pressure of nine centimeters of water. (Id.)

In March, Plaintiff was informed that he could not get his prescriptions refilled at the St. John's JFK Clinic until he scheduled an appointment because he had not seen the doctors there since May 2005. (Id. at 346.)

Two months later, in May, Plaintiff saw Dr. Kichura. (Id. at 545-46, 553.) Plaintiff reported continuing symptoms of dizziness and dyspnea. (Id. at 553.) He did not have any volume overload or chest pain. (Id.) There was no evidence of congestive heart failure. (Id.) He was to follow-up at the JFK Clinic with a possible referral to a psychiatrist for anti-depressant medication. (Id. at 545.)

In September, a refill was called into the JFK pharmacy based on Plaintiff's report that he had an appointment. (Id. at 347, 424.) When it was discovered he did not and had not been seen for over one year, Plaintiff was allowed to get refills one time only and informed that future scripts would have to be obtained from his doctors at Midwest Heart Group. (Id.)

Also in September, Plaintiff had a doppler echocardiogram and myocardial perfusion imaging by Dr. Kichura. (Id. at 369-70, 462-63, 542-44, 547-52, 562-64.) The tests revealed a normal left ventricular systolic function, a mild left atrial enlargement, a Stage 1 diastolic dysfunction, mild mitral valve regurgitation, and mild tricuspid valve regurgitation with no evidence of pulmonary hypertension. (Id.) It was noted that he had good exercise tolerance. (Id. at 563.) There was no significant change from a May 2005 study. (Id. at 370.)

In December, he reported to Dr. Kichura that he had had no dizziness or shortness of breath. (Id. at 527, 540, 542.) His blood pressure was better controlled and more appropriate. (Id. at 527.) He was to continue on his current regimen and follow up in three months. (Id.)

Plaintiff returned to the JFK Clinic at St. John's on March 5, 2007, with complaints of right-sided chest pain. (Id. at 425-28, 460-61, 538-39.) It was noted that he was continuing to smoke 15 cigarettes a day and drink a case of beer every other weekend. (Id. at 426, 460, 538.) His problems included alcoholic cardiomyopathy, obstructive sleep apnea, hypertension, tobacco abuse, alcoholism, depression, hypercholesterolemia, and history of carpal tunnel syndrome status post surgery two years earlier. (Id.) His blood pressure was under control; he was continued on his current medications for his heart problem and hypercholesterolemia. (Id. at 426-27, 538-39.) He was given a referral for psychiatry; however, it was noted that he was "not really motivated." (Id. at 427, 461, 539.) On testing, the strength in his hands was good. (Id.) It was decided that he should get the refills of his heart medication from his cardiologist. (Id. at 428.)

A few weeks later, Plaintiff saw Dr. Kichura. (Id. at 533-37.) He had not been on any medication for two weeks because he had run out. (Id. at 533.) He was to continue on his current medications and return in six months. (Id.)

In September, Plaintiff reported to Dr. Kichura that he had not had chest pains in a few days and had them only when he exerted himself. (Id. at 531-32.) The pains were consistent with stable angina. (Id. at 531.) He also had shortness of breath on exertion. (Id. at 532.) He had gained 23 pounds due to two medications, Zyprexa and Seroquel, that had been prescribed

by a psychiatrist.  (<u>Id.</u> at 531.)  There was no evidence of congestive heart failure.  (<u>Id.</u>)  He was to have blood tests done and return in six months.  (<u>Id.</u>)

Plaintiff saw Dr. Kichura again in March 2008.  (<u>Id.</u> at 528-31.)  He continued to have stable exertional angina and continued to smoke.  (<u>Id.</u> at 528.)  He had no other complaints.  (<u>Id.</u>)  His heart-related diagnoses included stable native vessel actherosclerotic coronary disease; secondary cardiomyopathy; left ventricle dysfunction without evidence of congestive heart failure; and mitral valve regurgitation without significant murmur.  (<u>Id.</u>)  He was again told to stop smoking.  (<u>Id.</u>)  He was to follow his current medical regimen and return in one year.  (<u>Id.</u>)

Plaintiff returned to St. John's in July for treatment of a stomach ache and dysuria (difficulty urinating) that had lasted for more than one year.  (<u>Id.</u> at 429-32.)  He described his other symptoms as being stable for the past couple of years.  (<u>Id.</u> at 430.)  He was still smoking and drinking heavily, drinking twelve beers within eight hours a couple of times a month.  (<u>Id.</u>)  He was started on a medication for possible gastroesophageal reflux disease (GERD).  (<u>Id.</u> at 431.)  It was noted that Plaintiff had no interest in quitting smoking or drinking.  (<u>Id.</u>)  He was to follow up in two months.  (<u>Id.</u>)

Plaintiff returned in September.  (<u>Id.</u> at 433-36.)  He reported no improvement on the medication for his GERD.  (<u>Id.</u> at 434.)  Nor had the GERD worsened.  (<u>Id.</u>)  An upper endoscopy was ordered and was normal.  (<u>Id.</u> at 312-15, 435.)  He was to quit smoking and drinking and start exercising.  (<u>Id.</u> at 435.)

Various assessments of Plaintiff were also before the ALJ.

In November 2005, Plaintiff applied for vocational rehabilitation services with the State of Missouri at the suggestion of a public defender.  (Id. at 171-92.)  Although he had had bilateral carpal tunnel release in July 2005 and had less grip strength, he could still lift up to fifty pounds.  (Id. at 178.)  It was determined that he could do light assembly work, but could not begin until his driver's license was reinstated.  (Id. at 186.)  In October 2006, his application was placed in the inactive files because, due to transportation problems, Plaintiff was "unable to proceed with placement services."  (Id. at 174.)

In July 2007, Judith McGee, Ph.D., completed a Psychiatric Review Technique form (PRTF) for Plaintiff.  (Id. at 294-304.)  Plaintiff was described as having an affective disorder and a substance addiction disorder.  (Id. at 294.)  The former was a dysthymic disorder; the latter was alcohol dependence.  (Id. at 297, 300.)  These impairments did not result in any restrictions of activities of daily living, difficulties in maintaining social functioning, and or difficulties in maintaining concentration, persistence, or pace.  (Id. at 302.)  There was insufficient evidence from which to determine whether they caused any repeated episodes of decompensation of any duration.  (Id.)

The same month, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff for the period from March 2007 to July 2007 was completed by an agency non-medical consultant.  (Id. at 305-10.)  The primary diagnosis was alcoholic cardiomyopathy; the secondary diagnosis was sleep apnea.  (Id. at 305.)  These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and stand, walk, or sit about six hours in an eight-hour day.

(<u>Id.</u> at 306.)  His ability to push or pull was otherwise unlimited.  (<u>Id.</u>)  He was limited to only occasionally doing various postural activities, such as balancing and kneeling.  (<u>Id.</u> at 308.)  He had no manipulative, visual, communicative, or environmental limitations.  (<u>Id.</u> at 308-09.)

Pursuant to his application, Plaintiff underwent a psychological evaluation in July 2007 by John A. Yunker, M.S., a licensed psychologist.  (<u>Id.</u> at 574-79.)  Plaintiff reported that his primary complaint was congestive heart failure.  (<u>Id.</u> at 574.)  He also had problems with his wrists.  (<u>Id.</u>)  He would get short of breath and dizzy and would black out and lose his balance.  (<u>Id.</u> at 574-75.)  These problems started approximately six months before his congestive heart failure.  (<u>Id.</u> at 575.)  He took an antidepressant, Cymbalta, and an antipsychotic, Seroquel.  (<u>Id.</u>)  His psychiatrist was Dr. Taca.  (<u>Id.</u>)  He had a few friends.  (<u>Id.</u>)  He could not pick up anything and last worked in August 1994.  (<u>Id.</u>)  He had to stop working because of a driving while intoxicated charge and loss of transportation to the job.  (<u>Id.</u>)  He then opened a shop at home so he could work without having to drive.  (<u>Id.</u>)  He only got two to three hours of sleep a night.  (<u>Id.</u>)  He felt arthritis in his back; his hands were numb; and his left foot hurt.  (<u>Id.</u>)  He sometimes was angry and wanted to hurt someone.  (<u>Id.</u>)  Two or three times a week, he had thoughts of suicide.  (<u>Id.</u>)  He did not act on either his assaultive or suicidal thoughts.  (<u>Id.</u>)  His mood was "mostly sad"; his affect was normal.  (<u>Id.</u>)  He smoked one pack of cigarettes a day and drank two twelve packs of beer a month.  (<u>Id.</u>)  On examination, he was cooperative and friendly and "quite outgoing."  (<u>Id.</u> at 576.)  He was fully oriented.  He performed in the average range for attention and concentration and his memory for recent and remote events was acceptable.  (<u>Id.</u>)  His vocabulary was well above average; his overall

knowledge of abstraction was slightly below average.  (Id.)  His judgment and comprehension

was average.  (Id.)  His estimated intelligence quotient (IQ) was within the average to above

average range.  (Id.)  The diagnosis was dysthymic disorder and alcohol dependence.  (Id.)

His GAF was 80.[7]  (Id.)

In October 2007, Dr. Kichura completed a residual functional capacity assessment

checklist for Plaintiff at the request of Plaintiff's attorney.  (Id. at 524-26.)  He had last seen

Plaintiff in September.  (Id. at 524.)  Dr. Kichura marked that Plaintiff's chest pain was

aggravated by fatigue, stress, and overuse but not by standing, sitting, and walking.  (Id. at

525.)  Prescribed medication had side effects which would impair his ability to work.  (Id. at

526.)  Plaintiff could only walk for fifty yards without having to rest and could continuously

sit or stand for only fifteen minutes.  (Id.)  He could lift or carry less than ten pounds.  (Id.)

His symptoms would constantly interfere with his attention and concentration.  (Id.)  He was

not able to deal with work stress.  (Id.)  He would likely be absent from work more than three

days a month, and he had not been employed for years.  (Id.)  He needed to avoid extreme cold

and heat, high humidity, chemicals, and cigarette smoke.  (Id.)

At the request of his attorney, Plaintiff was evaluated in November 2007 by David A.

Lipsitz, Ph.D., a psychologist.  (Id. at 570-73.)  His appearance and attitude were "good."  (Id.

at 570.)  He did not appear to be in any acute distress.  (Id. at 573.)  He had no difficulty with

posture or gait and had no involuntary movements.  (Id. at 570.)  His chief complaint was

_____

[7]A GAF between 71 and 80 is described as "[i]f symptoms are present, they are transient and
expectable reactions to psycho-social stressors . . . ; no more than slight impairment in social,
occupational, or school functioning . . . ."  DSM-IV at 34.

depression of six years duration and congestive heart failure, with which he had been diagnosed in August 2004. (Id.) He reported that he easily gets out of breath and cannot climb stairs or ladders. (Id.) His medication makes him dizzy and causes blackouts. (Id.) Plaintiff further reported that he gets depressed daily. (Id. at 571.) He stopped using his CPAP machine. (Id.) His appetite was good, he had gained thirty pounds in the past six months, but his energy level was low. (Id.) He often had suicidal thoughts, but had no actual plans or intent. (Id.) He had anxiety and panic attacks when stressed. (Id.) He broke out in a sweat easily and became "'very nervous and scared'" at least once a month. (Id.) He had no sex drive. (Id.) Plaintiff was seeing a psychiatrist, Dr. Taca, for the past six months and saw him every two months. (Id.) He was not seeing a counselor or therapist. (Id.) Plaintiff related that he had had psychiatric treatment in 2001 on an outpatient basis. (Id.) He saw a psychiatrist at St. John's and was on medication until he went to prison in 2002. (Id.) He resumed seeing a psychiatrist six months ago. (Id.) Both his parents were alcoholics, as were "a lot of other family members." (Id.) He last worked in April 2001. (Id. at 572.) He had "quite a few friends." (Id.) He was not allowed to drink at home or really do anything. (Id.) His friends were not allowed at his house. (Id.) He was not allowed to eat with the other family members. (Id.) Generally, he watches television and works in the yard. (Id.) On the Wechsler Adult Intelligence Scale – III (WAIS-III), Plaintiff had a verbal IQ of 85, a performance IQ of 100, and a full scale IQ of 91, placing him in the lower part of the average range for intellectual functioning. (Id.) His knowledge of mathematic functions was good and his general range of knowledge was within normal limits; on the other hand, his social awareness and judgment

were poor.  (Id.)  He was oriented to time, place, and person, and there was no evidence of any active psychotic functioning, delusions, hallucinations, paranoid ideations, or feelings of depersonalization.  (Id. at 573.)  Dr. Lipsitz described Plaintiff's affect as flat.  (Id.)  His diagnosis was major depression, recurrent, and alcohol dependence.  (Id.)  He assessed Plaintiff's GAF as 47.[8]  (Id.)  He opined that Plaintiff was in need of ongoing psychiatric treatment combining medication and psychotherapy.  (Id.)

In June 2008, Terry Dunn, Ph.D., completed another PRTF for Plaintiff.  (Id. at 277-87.)  Dr. Dunn concluded there was insufficient evidence from which to determine whether Plaintiff had a mental impairment, including an affective disorder or anxiety-related disorder.  (Id. at 277, 279, 281.)  Dr. Dunn noted that Plaintiff had been unable to attend a consultative examination because of incarceration.  (Id. at 287.)  His attorney had requested that it be rescheduled.  (Id. at 276.)

The same month, another PRFCA of Plaintiff was completed by a different agency non-medical consultant for the period from February 2008 to February 2009.  (Id. at 288-93.)  The primary diagnosis was congestive heart failure; the secondary diagnosis was sleep apnea.  (Id. at 288.)  The same physical limitations were described as in the previous PRFCA with the exception of an added environmental limitation of needing to avoid concentrated exposure to hazards.  (Id. at 289-92.)

A request to Dr. Eisenstein for medical records after March 2006 was returned unfilled because Plaintiff had not been a patient since then.  (Id. at 194.)  An April 2008 request to

---

[8]See note 3, supra.

Arturo Taca, M.D., for medical records was returned because Plaintiff had not been seen in his office.  (<u>Id.</u> at 196.)

**<u>The ALJ's Decision</u>**

Analyzing Plaintiff's application pursuant to the Commissioner's sequential evaluation process, see pages 25 to 27, below, and noting that the period at issue began on March 20, 2007, and ended on April 23, 2008, the ALJ first found that Plaintiff had not been engaged in substantial gainful activity during that period.  (<u>Id.</u> at 65.)

The ALJ next found that Plaintiff had severe impairments of chronic ischemic heart disease with angina, a sleep-related breathing disorder, cardiomyopathy, hypertension, obesity, and carpal tunnel syndrome.  (<u>Id.</u>)  He did not, however, have severe mental impairments.  (<u>Id.</u>)  The ALJ discounted Dr. Lipsitz' finding of a GAF of 47, noting that the score was not supported by the examination findings, including an observation that Plaintiff had a good attitude and was cooperative, and that Plaintiff had not required psychiatric hospitalizations.  (<u>Id.</u> at 65-66.)  Although Plaintiff had received some mental health treatment, the notes indicated little other than his own allegations.  (<u>Id.</u> at 66.)

The severe impairments Plaintiff did have did not, singly or in combination, meet or equal an impairment of listing-level severity.  (<u>Id.</u>)

The ALJ next found that Plaintiff had the residual functional capacity (RFC) to lift and carry twenty pounds occasionally and ten pounds frequently; to occasionally climb stairs, ramps, and ladders; to occasionally balance, stoop, kneel, crouch, or crawl; and no more than frequently handle objects, perform gross manipulation, and use his hands for fine-finger

manipulations. (Id.) He required a sit/stand option at the work site that allowed him to frequently change positions. (Id.) He could never climb scaffolds or ropes and was to avoid concentrated exposure to the hazards of heights and machinery. (Id.)

In assessing Plaintiff's RFC, the ALJ considered the objective medical evidence and the opinion evidence and evaluated his credibility. He observed that the paucity of recent records after Plaintiff underwent the bilateral carpal tunnel release suggested that the surgery was generally successful in relieving his symptoms. (Id. at 67.) Plaintiff had not been using his CPAP machine, which was inconsistent with his description of the limitations caused by his sleep apnea. (Id.) His blood pressure readings did not reflect any significant impairment. (Id. at 68.) And, although Plaintiff had a cardiac impairment, it had predated the period at issue, had improved, and had not resulted in any significant cardiac limitations during the relevant period. (Id.) For instance, when he complained to Dr. Kichura in September 2007 of exertional chest pain, he had had no progressive symptoms and had tolerated his current medical regimen. (Id.) Six months later, he had no change in his pattern. (Id.) He had no cyanosis, clubbing, or edema in his extremities and no neurological deficits. (Id. at 69.) In his September 2007 assessment, Dr. Kichura did not cite any objective medical evidence that led him to his conclusions; indeed, the evidence was of mild impairments and an average left ventricular ejection fraction. (Id.) His own records did not support the severe limitations found. (Id.) Morever, Plaintiff was noncompliant with his medications during the relevant period. (Id.) Plaintiff's allegations of pulmonary problems were unavailing as he continued

to smoke against medical advice.  (<u>Id.</u>)  And, there was no evidence that Plaintiff's obesity resulted in any significant degenerative joint disease or degenerative disc disease.  (<u>Id.</u>)

With his RFC, Plaintiff was unable to perform his past relevant work.  (<u>Id.</u> at 70.)  With his RFC, age, education, and work experience, he was able to perform the requirements of such positions as cashier, ticket taker, and order caller.  (<u>Id.</u> at 71.)  These jobs existed in significant numbers in the state and national economies.  (<u>Id.</u>)

During the relevant period, Plaintiff was not, therefore, disabled within the meaning of the Act.

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant

cannot be presently engaged in "substantial gainful activity." <u>See</u> 20 C.F.R. §§ 404.1520(b), 416.920(b); **<u>Hurd</u>**, 621 F.3d at 738.  Second, the claimant must have a severe impairment. <u>See</u> 20 C.F.R. §§ 404.1520(c), 416.920(c).  The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." <u>Id.</u>

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. <u>See</u> 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **<u>Warren v. Shalala</u>**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **<u>Moore</u>**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **<u>Ingram v. Chater</u>**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" **<u>Moore</u>**, 572 F.3d at 523 (quoting <u>Lacroix</u>, 465 F.3d at 887).  "The need for medical evidence, however, does not require the [Commissioner] to produce additional

evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, "'the ALJ must first evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." **Id.** (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant

work.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006);

**Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant

work, the burden shifts at step five to the Commissioner to establish that the claimant

maintains the RFC to perform a significant number of jobs within the national economy.  **Pate-**

**Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824

(8th Cir. 2001).  See also 20 C.F.R. §§ 404.1520(f), 416.920(f).  The Commissioner may meet

his burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical

questions that "'set forth impairments supported by substantial evidence on the record and

accepted as true and capture the concrete consequences of those impairments,'" **Jones v.**

**Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th

Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will

find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is

conclusive upon this Court "'if it is supported by substantial evidence on the record as a

whole.'"  **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547

F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001).

"'Substantial evidence is less than a preponderance but is enough that a reasonable mind would

find it adequate to support the conclusion.'"  **Wiese**, 552 F.3d at 730 (quoting Eichelberger v.

Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)).  When reviewing the record to determine

whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ erred (1) when assessing his mental impairment because (a) his homicidal and suicidal ideations and his GAF of 47 establish that his impairment is severe and (b) he did not consider the effect of Plaintiff's mental impairment on his ability to work, (2) by failing to give the opinion of Dr. Kichura the proper weight, and (3) failing to contact Dr. Kichura if he felt the doctor's report was not sufficient.

Plaintiff's Mental Impairment. The ALJ found that Plaintiff did not have a severe mental impairment.

A "severe impairment is defined as one which 'significantly limits [the claimant's] physical or mental ability to do basic work activities.'" **Pelkey v. Barnhart**, 433 F.3d 575, 578

(8th Cir. 2006) (quoting 20 C.F.R. § 404.1520(c)) (alteration in original). Conversely, an impairment is not severe if it "amounts only to a slight abnormality that would not significantly limit the claimant's ability to work," i.e., "[it] would have no more than a minimal effect on the claimant's ability to work[.]" **Kirby v. Astrue**, 500 F.3d 705, 707 (8th Cir. 2007). "Severity is not an onerous requirement . . . , but it is also not a toothless standard . . . ." **Id.** at 708 (internal citations omitted).

In support of his argument that his mental impairment is severe, Plaintiff cites portions of Dr. Yunker's report and the evaluation by Dr. Lipsitz. The references in Dr. Yunker's report to anger and suicidal and assaultive thoughts are based on Plaintiff's own statements. See **Gates v. Astrue**, 627 F.3d 1080, 1082 (8th Cir. 2010) (rejecting argument that ALJ erred in assessing claimant's mental impairments when medical opinion cited by claimant was "largely based" on her own statements). His reference to Plaintiff having a psychiatrist is in error; the record establishes that, although Plaintiff referred to Dr. Taca as his psychiatrist, he never sought psychiatric or psychological treatment, particularly during the relevant time period. Moreover, Dr. Yunker concluded that Plaintiff had a GAF of 80, see note 7, supra, which reflects transient, non-severe symptoms.

Dr. Lipsitz, however, assessed Plaintiff as having a GAF of 47, indicative of severe symptoms, and opined that he needed psychiatric treatment. "[A]n ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it." **Jones**, 619 F.3d at 974. These opinions are clearly based on Plaintiff's own statements, e.g., Plaintiff reported that he was depressed daily and had been for six years, and not on Dr. Lipsitz'

observations, which include that Plaintiff did not appear to be in acute distress; had a good appearance and attitude; was oriented to time, place, and person; and had *no evidence* of psychotic functioning, delusions, hallucinations, or paranoid ideations.

Plaintiff further argues that the ALJ erred by not evaluating his mental impairments in compliance with 20 C.F.R. § 416.920a.[9]  In support of this argument, Plaintiff cites his thoughts of suicide and homicide and his GAF of 47.  The latter is unavailing for the reasons set forth above.  The former is unavailing given the lack of any treatment for such at any time, including during the relevant period.  Additionally, Plaintiff's argument that his mental illness, even if not severe, should have been considered in the assessment of his RFC is unavailing given the lack of any evidence that any mental illness affected his RFC.

Dr. Kichura's Report.  Dr. Kichura treated Plaintiff three times during the relevant period.  When he first saw him, in March 2007, Plaintiff had not taken his heart medication for a few months.  When he next saw him, in September 2007, he reported chest pains only on exertion, consistent with stable angina, and shortness of breath only on exertion.  There was no evidence of congestive heart failure.  When he saw Plaintiff for the third time, in March 2008, Plaintiff's only complaint was of stable exertional angina.  He was told, again, to stop smoking.  He was to follow his current medical regimen and did not have to return for one year.  Three months after the period in question ended, Plaintiff reported that his relevant symptoms had been stable for a couple of years.  He had no interest in quitting smoking.

---

[9]Plaintiff mistakenly cited the regulation governing the evaluation of mental impairments of applicants for disability insurance benefits.  A mirror regulation, 20 C.F.R. § 416.920a, is applicable to SSI applicants.

Between the second and third visits, Dr. Kichura completed an RFC assessment of Plaintiff at his request. He described Plaintiff's chest pain as aggravated by fatigue, stress, and overuse, but not by the exertional activities of standing, sitting, and walking. Plaintiff was inexplicably limited, however, in those activities and would not be able to cope with work stress. He needed to avoid cigarette smoke, although Plaintiff continued to smoke. He would likely be absent from work at least three days a month. Plaintiff argues that the ALJ failed to give this assessment the proper weight.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 680 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord **Halverson v. Astrue**, 600 F.3d 922, 929 (8th Cir. 2010); **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009). "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." **Wagner**, 499 F.3d at 849 (internal quotations omitted). Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" **Id.** (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir.2000)).

Neither Dr. Kichura's own treatment notes or the other medical evidence support the limitations he describes in his assessment. Indeed, Plaintiff's angina was consistently described as stable, there were no changes to his medical regimen, and there was nothing to suggest that

his chest pain and shortness of breath would not be accommodated by the sit/stand option and the lifting, carrying, and climbing limitations included in the ALJ's RFC.

"It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes," **Davidson**, 578 F.3d at 843, as was Dr. Kichura's, or when it consists of conclusory statements, as did Dr. Kichura's, **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010).  <u>See</u> <u>also</u> **Clevenger v. S.S.A.**, 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes); **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995) ("The weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements.").

In his final argument, Plaintiff contends that the ALJ should have recontacted Dr. Kichura if he felt the doctor's report was not sufficient.  This argument misapprehends the ALJ's finding.  He did not find the report insufficient; he found it did not support Plaintiff's claim of disability.  "The ALJ does not 'have to seek additional clarifying statements from a treating physician unless a *crucial issue* is undeveloped.'" **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010) (quoting <u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004)).  A crucial issue was not undeveloped; rather, it was resolved unfavorably to Plaintiff.  <u>See e.g.</u> **Steed v. Astrue**, 524 F.3d 872, 876 (8th Cir. 2008) (finding that claimant's failure to provide medical evidence supporting her allegations of work limitations "should not be held against the ALJ when there *is* medical evidence that supports the ALJ's decision"); **Samons v. Astrue**, 497 F.3d 813, 819 (8th Cir. 2007) (finding ALJ need not have contacted claimant's treating

physician after finding that physician's opinion was inadequate to establish disability when the opinion was not inherently contradictory or unreliable).

**Conclusion**

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  10th  day of March, 2011.